UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ROXY KNIGHTLY,<br><br>   Plaintiff,<br><br> v.<br><br>EGG HARBOR CAFÉ, INC.,<br><br>   Defendant. | No. 24 CV 13149<br><br>Judge Georgia N. Alexakis |

MEMORANDUM OPINION AND ORDER

  Plaintiff Roxy Knightly worked as a barista at defendant Egg Harbor Café, Inc. from September 2024 until October 2024, when she was terminated. Knightly sued Egg Harbor, alleging that her termination was because of her sex and LGBTQ+ status, that she was subjected to workplace harassment on the same basis, and that she was retaliated against for complaining of her mistreatment, all in violation of Title VII of the Civil Rights Act of 1964. Knightly also claims that her termination violated public policy and was thus unlawful under Illinois law. Egg Harbor now moves to dismiss. For the following reasons, the motion [26] is granted in part and denied in part.

**I. Legal Standards**

  To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a plaintiff must allege facts sufficient "to raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). A court must accept the complaint's factual allegations as true and draw all reasonable inferences in the plaintiff's favor (as the Court does in the section that follows), but a court need not

accept legal conclusions or "threadbare recitals" supported by "conclusory statements." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

## II. Background

Knightly was hired as a barista at Egg Harbor in September 2024. [30] ¶ 14. Knightly is a woman, a member of the LGBTQ+ community, and a victim of domestic violence. *Id.* ¶¶ 16, 18. The domestic violence Knightly experienced resulted in back and neck injuries that limit her ability to stand and perform physically demanding activities without occasional rest. *Id.* ¶¶ 18–19. In early September 2024, Knightly asked Egg Harbor managers for two days off for medical appointments related to these injuries. *Id.* ¶ 21. Knightly's request was granted without any requirement that she provide documentation. *Id.* ¶ 22. Knightly also sometimes sat on a chair behind the bar of the café to manage her pain, which management did not initially object to. *Id.* ¶¶ 23–24.

At the end of September 2024, Knightly heard a supervisor named Josue[1] say that he would disown his son if the son were gay. *Id.* ¶ 25. This made Knightly feel uncomfortable and unsafe. *Id.* ¶ 26. Knightly does not indicate whether Josue or anyone else at Egg Harbor knew at this time that she identified as a member of the LGBTQ+ community.

Sometime in mid-October 2024, the chair behind the bar was removed. *Id.* Knightly moved it back, but was questioned about this by Josue, who then suggested Knightly sit in the back office instead. *Id.* ¶¶ 27–28. Knightly declined because

---

[1] Knightly does not include Josue's last name in the complaint. [30] ¶ 25.

2

sitting in the back office was impractical and too far from her team and job duties. *Id.* ¶¶ 28–29. Knightly alleges that "a heterosexual male colleague of [hers] was permitted to use the same chair due to an injury unrelated to domestic violence without issue." *Id.* ¶ 30. The complaint does not specify whether "the same chair" refers to the chair behind the bar; it similarly does not specify whether the male colleague was, like Knightly, a barista performing his job duties behind the bar. Viewing the allegations in the light most favorable to Knightly, though, the Court will infer that "the same chair" here refers to the chair behind the bar.

Around October 25, 2024, Josue heard Knightly "talking about LGBTQ+ related topics with co-workers, including how she was interested in women and had met a woman she wanted to go on a date with." *Id.* ¶ 32. Knightly alleges that "Josue's demeanor changed noticeably following her open discussion of her LGBTQ+ identity" and that Josue then "went outside and made several lengthy phone calls while staring at [Knightly] through the window." *Id.* ¶¶ 33–34.

"A couple of hours later," Knightly was "called into an HR meeting" and told that Josue had reported that Knightly had requested a medical accommodation. *Id.* ¶ 35. Knightly maintained that she had not requested a medical accommodation and explained that "she had actually utilized the stool in relation to her domestic violence related injuries." *Id.* ¶ 36. The human resources representative informed Knightly that she could provide medical documentation to Egg Harbor and would then be allowed to sit in the back office as needed. *Id.* ¶ 37. Knightly felt like this offer was intended "to pressure [her] into accepting a lose-lose situation, where accepting the

accommodation would harm job performance." *Id.* ¶ 38. Knightly again "clarified that she had not made such a request and did not need the accommodation." *Id.*

During this discussion with the human resources representative, Knightly tried to bring up her concerns about Josue, including his misrepresentation of her use of the stool, as well as "his inappropriate behavior and hostility toward her on the basis of her LGBTQ+ identity and perceived disability." *Id.* ¶ 39. The human resources representative cut Knightly off "in a hostile manner" and instructed her to request a meeting on another day to discuss her concerns with Josue. *Id.* ¶ 40. According to Knightly, the human resources representative also directed her "to bring her concerns regarding Josue to Josue himself." *Id.* ¶ 41.

After the human resources meeting, Knightly, in her own words, "spoke with Josue about his discriminatory misrepresentation of her related to her utilization of the domestic violence related accommodation." *Id.* ¶ 42. Josue "responded with hostility." *Id.* According to Knightly, Josue "admitted to lying to HR about Plaintiff's request for accommodations," and then ended the conversation "in a hostile manner" and threatened to report Knightly to human resources again. *Id.* ¶ 43. (Knightly does not say what Josue threatened to report her for.) This interaction left Knightly in tears. *Id.* ¶ 44.

After the conversation with Josue, Knightly returned to the front of the restaurant and spoke to a coworker. *Id.* ¶ 45. Josue approached and "yelled at [Knightly] to clock out and leave, creating a scene in front of customers." *Id.* Josue

4

then told Knightly that she was suspended, though did not provide any reason for the suspension. *Id.* ¶ 46.

On October 26—the next day—Knightly "was terminated by HR for 'lack of professionalism' and 'making a scene,'" reasons Knightly characterizes as pretextual. *Id.* ¶ 47. Knightly notes that the Egg Harbor employee handbook requires three written warnings before termination, while she had only received a single verbal warning before her termination. *Id.* ¶ 48. Knightly also alleges that the activity that provoked the verbal warning—"vaping in a closet"—was engaged in by non-LGBTQ+ employees without consequence. *Id.* Knightly also alleges that her performance met or exceeded Egg Harbor's expectations during the entire period of her employment. *Id.* ¶ 49.

## III. Analysis

Knightly brings claims of sex-based discrimination and harassment (Counts I and II) and retaliation (Count III) under Title VII, as well as a claim of unlawful termination contrary to public policy under state law (Count IV).[2] The Court discusses each theory of liability in turn.

---

[2] In a cursory response to defendant's motion to dismiss, plaintiff writes that "she asserts claims under the American with Disabilities Act" and "seek[s] redress for disability-based discrimination and retaliation." *See* [37] at 1. But no reference to the ADA or disability-based discrimination and retaliation appears in the operative complaint, *see* [30], and plaintiff makes no argument related to the ADA in her more comprehensive response to defendant's motion, *see* [38]. The Court therefore resolves defendant's motion with the understanding that plaintiff has asserted no claims under the ADA. Instead, and given past practice, the Court presumes plaintiff erroneously referenced the ADA when offering an overview of her claims in [37]. *See also* [29] (plaintiff earlier filed a version of her first amended complaint naming a different plaintiff and a different defendant and alleging wholly unrelated facts).

### A. Title VII Discrimination and Harassment (Counts I and II)

Egg Harbor first argues that Knightly's claims of sex discrimination on the basis of her LGBTQ+ identity, *see Bostock v. Clayton Cnty., Georgia,* 590 U.S. 644, 683 (2020) (LGBTQ+ discrimination a form of sex discrimination under Title VII), "fail[s] because [Knightly] does not allege that Egg Harbor was aware of her status as a member of the LGBTQ+ community" or that "her LGBTQ+ status was a contributing factor in her termination." [26] at 3. Egg Harbor relies on *Dean v. Metro Staffing*, which granted the employer's summary-judgment motion where the plaintiff "ha[d] not introduced sufficient evidence showing that Metro Staff terminated him because of his sexual orientation." No. 18-CV-07240, 2021 WL 1208972, at *7 (N.D. Ill. Mar. 29, 2021).

But, as summarized above, Knightly alleges that Josue overheard her discussing her desire to date a woman, immediately made several phone calls, and that Knightly was brought in for a meeting with human resources shortly after the calls. [30] ¶¶ 32, 34–35. It is true that Knightly does not directly "allege that Human Resources ("HR") knew of her sexual orientation," [26] at 4, but at this stage of the proceedings, the facts Knightly alleges are enough to allow the inference that Egg Harbor was aware of Knightly's LGBTQ+ status at the time of her termination.

Knightly also directly alleges that she "was terminated on the basis of sex (LGBTQ+ female)." [30] ¶ 50. While the Court need not accept legal conclusions as fact, Seventh Circuit case law permits the inference of intentional discrimination from evidence like suspicious timing and comments directed at others in the protected group. *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 736 (7th Cir. 1994); *see also Joll*

6

*v. Valparaiso Cmty. Sch.*, 953 F.3d 923, 929 (7th Cir. 2020) ("Direct as well as circumstantial evidence may support an inference of causation, and thus intent.") (citing *Troupe*, 20 F.3d at 736). Here, Knightly alleges that she was called into human resources the same day that a supervisor discovered that she identifies as part of the LGBTQ+ community and was terminated the next, and that the supervisor who initiated this process had previously made derogatory remarks about LGBTQ+ individuals. *Id.* ¶ 25. Accepting Knightly's allegations as true, and drawing all reasonable inferences in her favor, this is sufficient to establish for now that Knightly's termination was the result of intentional discrimination. *See also Boyd v. Advanced Physicians*, No. 22-CV-7012, 2024 WL 1363421, at *3 (N.D. Ill. Mar. 29, 2024) (to survive a motion to dismiss, a complaint alleging discrimination under Title VII need only satisfy a "minimal pleading standard" and "give the defendant 'sufficient notice to enable the defendant to begin to investigate and prepare a defense'") (quoting *Tamayo v. Blagojevich*, 526 F.3d 1074, 1084 (7th Cir. 2008)).

Knightly separately alleges that she was subjected to sex-based harassment in violation of Title VII. [30] ¶¶ 66–73 (Count II). Sex-based harassment is "conceptually distinct from sex discrimination, but [] can fall within Title VII's sweep." *Bostock*, 590 U.S. at 669. Knightly claims that the harassment she experienced created a hostile work environment in violation of Title VII, [38] 5–6, which among other things requires that the harassment be on the basis of a protected identity and "severe or pervasive enough to create a hostile work environment." *Equal Emp. Opportunity Comm'n v. Costco Wholesale Corp.*, 903 F.3d 618, 625 (7th Cir. 2018) (citation

7

omitted). The severe and pervasive standard is "extreme." *Id.* (citation omitted). In evaluating whether alleged discriminatory conduct is severe or pervasive, the Court does not "carve up the incidents of harassment and then separately analyze each incident," but rather considers "all the circumstances of the case." *Id.* at 626. (customer's touching of and speech towards employee evaluated "in the context of his stalking [of the employee]").

Knightly points to the following behavior as evidence that the harassment she alleges was severe and pervasive: Josue's September 2024 comment about disowning a gay son, Josue "star[ing] at her through a window" while making phone calls after overhearing Knightly's discussion of her own sexual orientation in October 2024, Josue "falsely report[ing] that [Knightly] requested a medical accommodation," and Josue yelling at her in front of customers and suspending her on October 25 "without explanation." [38] at 5–6.

Knightly has not alleged that Josue or anyone else at Egg Harbor was aware of her LGBTQ+ identity at the time of Josue's September 2024 comment, so that comment could not have been "because of her sex" for the purpose of the LGBTQ+ harassment claim. *Costco*, 903 F.3d at 625.

This leaves the events of October 25, which the Court concludes do not rise to the "extreme" level required to show severe and pervasive harassment. First, Knightly does not explain why Josue reporting Knightly's request for a chair as a "request[] [for] a medical accommodation," [30] ¶ 35, qualifies as harassment at all, let alone harassment related to Knightly's LGBTQ+ identity. Knightly does not, for

8

example, articulate how this characterization of her request, which she describes as done "in relation to her domestic violence related injuries," was offensive or harmful— either from her point of view as a member of LGBTQ+ community or from an objective point of view. *Costco*, 903 F.3d at 625 (hostile work environment claim "requires the unwelcome conduct to be severe or pervasive from both a subjective and an objective point of view"). If anything, a reasonable individual could understand why a workplace supervisor might alert human resources to Knightly's request so that Egg Harbor could satisfy any reasonable-accommodations obligations it may have under the ADA. *See Jenkins v. Chicago Transit Auth.*, 15 C 08415, 2020 WL 868535, at *8 (N.D. Ill. Feb. 20, 2020) ("Awareness of a disability triggers the obligation to initiate an informal, interactive process to identify potential reasonable accommodations.") (cleaned up).

That leaves as the relevant acts of harassment to analyze Josue yelling at Knightly in front of customers before suspending her[3] and staring at Knightly through the window. But while these experiences may have been distressing, Title VII is not a "general civility code," *Oncale v. Sundowner Offshore Servs., Inc.*, 523

---

[3] Knightly references her suspension and termination while discussing her hostile work environment claim under Count II, *see* [38] at 6, but the Court understands these alleged adverse employment actions to be part of Knightly's claim of workplace discrimination under Count I rather than evidence of severe and pervasive harassment. And even if Knightly intended to use her suspension as evidence of harassment, a single instance of a workplace suspension immediately before termination would not rise to the necessary level of severity. *See Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 982 (7th Cir. 2014) (at summary judgment, no hostile work environment from "unfair suspensions, financially harmful floor reassignments, unjustified write-ups, and unusually close supervision" because this workplace discipline did not create an "objectively offensive" environment where the "work environment was not physically threatening, nor was it openly racist, nor did it unreasonably interfere with plaintiffs' performance.").

U.S. 75, 80 201 (1998), and does not prohibit "a crude or unpleasant workplace," *Smith v. Illinois Dep't of Transportation*, 936 F.3d 554, 561 (7th Cir. 2019). Knightly provides no details about the yelling or suspension beyond alleging that "Josue approached [her] and yelled at [her] to clock out and leave, creating a scene in front of customers" and that Josue then suspended Knightly without providing a reason. [30] ¶¶ 45–46. Even if the Court were to infer, based on the timing at play, that the yelling was connected to Knightly's LGBTQ+ identity, a single instance of verbal abuse does not rise to the level of severity necessary to create a hostile workplace. *See Brooks v. Avancez*, 39 F.4th 424, 441 (7th Cir. 2022) ("[O]ccasional vulgar language, and coarse, rude, or boorish behavior will not amount to a hostile work environment" unless the behavior is "so pervasive or severe as to interfere with an employee's work performance."); *Sheaffer v. Glendale Nissan, Inc.*, No. 19 C 3899, 2021 WL 4893752, at *3 (N.D. Ill. Oct. 20, 2021) ("[S]poradic use of abusive language, gender-related jokes, and occasional teasing … do not amount to actionable harassment.") (quoting *Savino v. C.P. Hall Co.,* 199 F.3d 925, 933 (7th Cir. 1999)).

Similarly, a single occasion of Josue staring at Knightly cannot meet the severity threshold, even if combined with the yelling or suspension later that day. *See Savino*, 199 F.3d at 933 (supervisor staring at plaintiff and failing to give her gift certificate not severe or pervasive); *c.f. Miles-Cacella v. Int'l Fellowship of Christians & Jews*, No. 18 CV 7563, 2019 WL 2422874 (N.D. Ill. June 10, 2019) (sex harassment claim survived dismissal where male supervisor repeatedly stared at female

10

plaintiff's breasts, spread his legs "suggestively," and yelled at plaintiff "but not other men").

For these reasons, although Knightly's Title VII discrimination claim passe muster, her Title VII harassment claim does not.

### B. Title VII Retaliation (Count III)

Knightly next claims that she was retaliated against in violation of Title VII. "To state a claim for retaliation under Title VII, a plaintiff must present evidence of (1) a statutorily protected activity; (2) a materially adverse action taken by the employer; and (3) a causal connection between the two." *Cervantes v. Ardagh Grp.*, 914 F.3d 560, 566 (7th Cir. 2019) (cleaned up). Protected activity includes reporting harassment prohibited by Title VII. *See Alley v. Penguin Random House*, 62 F.4th 358, 362 (7th Cir. 2023). The conduct prompting such a report need not be serious enough to rise to the level of a Title VII violation to support a retaliation claim. *See Magyar v. Saint Joseph Reg'l Med. Ctr.*, 544 F.3d 766, 771 (7th Cir. 2008). Rather, the plaintiff must merely have a "sincere and reasonable that she was opposing an unlawful practice," even if that belief proves incorrect. *Id.* (cleaned up). Egg Harbor does not dispute that Knightly suffered a materially adverse action, nor could it, as termination "clearly constitute[s] a materially adverse action." *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 664 (7th Cir. 2006). The Court therefore focuses on the first and third prongs.

As to the first prong, Egg Harbor argues that Knightly has not alleged any statutorily protected activity because she "does not allege that she actually advised HR of her alleged issues with Josue. Instead, she alleges that she had *attempted* to

11

bring up her concerns and was advised that she would need to schedule another meeting with HR to address her concerns." [26] at 7 (emphasis added). Put another way, Egg Harbor takes the position that because its human resources representative did not permit Knightly to report her concerns at the time Knightly attempted to do so, her attempt cannot provide a basis for Title VII liability.

This position is, to put it mildly, problematic. At the threshold, Knightly alleges that she "attempted to bring up concerns she had about Josue misrepresenting the situation, as well as his inappropriate behavior and hostility toward her on the basis of her LGBTQ+ identity and perceived disability." [30] ¶ 39. Knightly further alleges that "before [she] could *finish* voicing her concerns, HR spoke to [Knightly] in a hostile manner and told [Knightly] she would have to request a meeting with them another day to address her concerns," and that she was also "told by HR that she needed to bring her concerns regarding Josue to Josue himself." *Id.* ¶¶ 40–41 (emphasis added).

It is thus not clear from the face of the complaint that Knightly *did not* inform Egg Harbor's human resources representative that she felt she had been subjected to harassment based on her LGBTQ+ identity. The complaint merely says that she was interrupted—by the Egg Harbor's own human resources representative—before she "finish[ed] voicing her concerns." [30] ¶ 40. Reading the allegation in the light most favorable to Knightly, as the Court must do at this juncture, she has alleged that she

12

informed Egg Harbor of at least *some* of her concerns, and would satisfy the first prong on that basis alone.[4]

As to the third prong—the causal link between the protected activity and the adverse action—Knightly argues that the suspicious timing of her suspension and termination, combined with Egg Harbor's failure to appropriately respond to her concerns, allow the reasonable inference that Knightly was terminated as a result of the protected activity. [38] at 11. Egg Harbor argues in its reply that "there is no allegation that Egg Harbor's Human Resources Department was aware of [Knightly's] sexual orientation when it terminated her employment" and thus, presumably, that there could be no causal link between the firing and the activity. [39] at 4.

But Egg Harbor appears to conflate the discrimination and retaliation claims. Whether Egg Harbor knew of Knightly's sexual orientation is relevant to the first but irrelevant to the second. The question instead is, whether Egg Harbor knew that Knightly engaged in a protected activity—like attempting to report harassment—and if she was terminated because of activity. As discussed above, the complaint alleges that Knightly attempted to report her concerns to Egg Harbor human resources, and

---

[4] Even if the Court were to assume that Egg Harbor's human resources representative successfully prevented Knightly from expressing her concerns about her treatment based on her LGBTQ+ identity, allowing an employer to avoid liability for retaliation by interrupting reports of harassment would frustrate a core purpose of Title VII. Egg Harbor does not cite any authority for such a rule. Indeed, the Seventh Circuit has instructed that "[p]rotected activity is some step in opposition to a form of discrimination that the statute prohibits." *Ferrill v. Oak Creek-Franklin Joint Sch. Dist.*, 860 F.3d 494, 501 (7th Cir. 2017) (cleaned up). An attempt to report harassment based on LGBTQ+ identity very much strikes this Court as "some step in opposition" to that harassment.

13

that this attempt—which Egg Harbor was necessarily aware of—was protected activity. Egg Harbor makes no other argument regarding causation. The Court thus finds that the third prong is met and that Knightly has stated a claim for retaliation under Title VII.

### C. Wrongful Termination in Violation of Public Policy (Count IV)

Finally, Knightly argues that her termination violated Illinois common law as a wrongful termination in violation of public policy. [30] ¶¶ 85–89. "The elements for a retaliatory discharge cause of action are that a litigant (1) has been discharged; (2) in retaliation for his activities; and (3) the discharge violates a clear mandate of public policy." *Webber v. Wight & Co.*, 368 Ill. App. 3d 1007, 1021 (1st Dist. 2006). The public policy Knightly invokes is the Illinois Victims Economic Security and Safety Act, which provides legal protections to victims of domestic violence. [30] ¶¶ 2, 87–88; 820 ILCS 180. "Specifically, Plaintiff alleges that she was terminated in retaliation for disclosing that she was a victim of domestic violence and requesting two days off work to recover from related injuries." [38] at 12.

But "[t]he key here is that there is a causal relationship among these elements." *Webber*, 368 Ill. App. 3d at 1021 (citation omitted). Knightly does not address causation directly for the state-law claim. And to the extent Knightly intends to rely on suspicious timing for this claim as well, it is not enough. The Court has concluded above that suspicious timing can, at this phase, support a causal inference regarding her Title VII claims, where less than 24 hours elapsed between the relevant events. But more than a month passed between Knightly's request for time off—which was granted—and her termination. That is not enough by itself to support a

14

reasonable inference of retaliation. *See Igasaki v. Illinois Dep't of Fin. & Prof'l Regulation*, 988 F.3d 948, 959 (7th Cir. 2021) (in Title VII context, "[f]or an inference of causation to be drawn solely on the basis of a suspicious-timing argument, we typically allow no more than a few days to elapse between the protected activity and the adverse action").

Knightly thus has not stated a claim for wrongful termination under Illinois law.

## IV. Conclusion

For the reasons stated above, Egg Harbor's motion to dismiss [26] is granted in part and denied in part. Counts II and IV are dismissed without prejudice. The Court grants Knightly leave to file a second amended complaint on or before 11/6/25 if she can cure the deficiencies with the dismissed claims while still complying with her Rule 11 obligations. *See Runnion ex rel. Runnion v. Girl Scouts of Greater Chi. & Nw. Ind.*, 786 F.3d 510, 519–20 (7th Cir. 2015). If Knightly elects not to file a second amended complaint by 11/6/25, the dismissal of those claims will convert to a dismissal with prejudice.

_____
Georgia N. Alexakis
United States District Judge

Date: 10/23/25

15